```
 1                IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   UNITED STATES OF AMERICA,       )
                                     ) No. 2:21-MJ-8239-RBM
 4           Plaintiff,              )
                                     )
 5   v.                              ) April 2, 2021
                                     )
 6   BRIAN MATTHEW THIBODEAU,        )
                                     )
 7           Defendant.              )
     _____) El Centro, California
 8

 9         TRANSCRIPT OF DIGITALLY RECORDED PROCEEDINGS

10                      (Detention Hearing)

11     BEFORE THE HONORABLE ANDREW G. SCHOPLER, MAGISTRATE JUDGE

12

13   APPEARANCES:
     FOR THE PLAINTIFF:      BRANDON KIMURA
14                           Assistant U.S. Attorney
                             U.S. Attorney's Office
15                           Southern District of California
                             880 Front Street, Room 6293
16                           San Diego, CA  92101-8893
                             (619)557-5610
17

18   FOR THE DEFENDANT:      DIANE REGAN
                             Attorney at Law
19                           414 S. 4th Street
                             El Centro, CA  92243
20                           (760)879-2699
                             dmresq@yahoo.com
21

22   COURT REPORTER:         AMANDA M. LeGORE
                             RDR, CRR, CRC, FCRR, CACSR
23                           U.S. District Court
                             333 West Broadway, Suite 420
24                           San Diego, CA 92101
                             amanda_legore@casd.uscourts.gov
25
```

```
 1              (Friday, April 2, 2021; 10:36 a.m.)
 2
 3                      P R O C E E D I N G S
 4
 5          THE CLERK:  We'll call matter number 5 on the
 6  calendar.  21-MJ-8239, USA v. Brian Matthew Thibodeau.
 7          MS. REGAN:  Good morning, again, your Honor.  Diane
 8  Regan for Mr. Thibodeau, who is --
 9          MR. KIMURA:  Good morning, your Honor.  Brandon
10  Kimura for the United States.
11          THE COURT:  Good morning, Ms. Regan.  Good morning,
12  Mr. Kimura.
13          MS. REGAN:  Mr. Thibodeau is going to appear by
14  video, your Honor.  And his family is coming into the
15  courtroom.  His mother and his brother.
16          THE COURT:  Okay.  Wonderful.  I see them here.
17          MS. REGAN:  This is his mother, your Honor.  Martina
18  Bradshaw and his brother.
19          (Pause.)
20          (Indiscernible off-the-record discussion.)
21          THE COURT:  Which number?
22          THE CLERK:  Number 5, your Honor.
23          THE COURT:  Mr. Thibodeau, is that you, sir?
24          THE DEFENDANT:  Yes.
25          THE COURT:  All right.
```

1       Ms. Regan, have you explained to your client that he
2  has the right to appear in person for his court proceedings?
3       MS. REGAN:  Yes, your Honor.  He's okay appearing by
4  video for now, due to the COVID concerns.
5       THE COURT:  Is all of that correct, Mr. Thibodeau?
6       THE DEFENDANT:  Yes, your Honor.
7       THE COURT:  Okay.  I will allow you to appear by
8  videoconference here today.
9       We have some of your family members here in the
10 audience to support you.  Thank you for being here today.
11      And -- all right.  Mr. Thibodeau, I've got a -- I
12 guess we're here for a detention hearing.
13      This is -- are the parties ready to proceed with the
14 detention hearing?
15      MR. KIMURA:  Yes, your Honor.
16      MS. REGAN:  Yes, your Honor.
17      THE COURT:  All right.  It is the Government's motion
18 for detention, so I'll give them first argument.
19      MR. KIMURA:  Yes, your Honor.
20      The United States has charged Mr. Thibodeau with
21 possession of a National Firearms Act weapon, an item that has
22 not been registered; specifically a suppressor.
23      This case originated from the -- a package that was
24 addressed to Mr. Thibodeau.  It was intercepted by Customs and
25 Border Protection and referred to HSI.

1          HSI conducted a controlled delivery of the package,
2  which contained -- they confirmed contained a suppressor.  The
3  preliminary analysis for that was conducted by an ATF agent
4  familiar with firearm items.
5          The controlled delivery was successful.  Mr. -- The
6  package was delivered to Mr. Thibodeau himself.  And then a
7  search warrant was executed after he had taken possession of
8  it.
9          During the search warrant, they recovered potentially
10 an almost complete AR-15.  All the parts were there.  It's what
11 we -- I think they probably refer to as ghost guns.  The lower
12 receiver was the only thing that was unfinished at the time.
13 The AR-15 would have received the silencer, and it would have
14 been an immediate bolt-on item.
15         The officers also seized and confiscated a handgun as
16 a -- which had a high-capacity 32-round clip, which is illegal
17 both for California and by federal standards.
18         The search also recovered -- and this is noted in the
19 written complaint itself -- white supremacist material.
20 Specifically, when it refers to coordinated attacks, I believe
21 that's the reference to *The Turner Diaries*, which I don't know
22 if your Honor is aware of.  It's basically a white supremacist
23 fiction novel that's become very integrated into white
24 supremacist terminology and ideology.  Basically, it's about a
25 fictional insurrection against the government.

1    They also found what I understand to be Nazi and
2 white supremacist material and symbolism within his -- the
3 living area.
4    He -- he was arrest -- not arrested.  I think it
5 was -- I believe he was arrested at the time.  Taken back for
6 an interview.  Mirandized.  During that Miranda statement, he
7 stated that he purchased the -- the silencer or -- as a fuel
8 filter or (indiscernible) trap.  These things are often
9 advertised as such.  And that he understood that most people,
10 if not almost everyone who purchases these things, uses them as
11 a suppressor.
12    And this is -- this is actually a -- you know, in --
13 when examining the suppressor, silencers, I've seen these
14 before, coming through.  This one is unusual because it was to
15 be bolted on.  Many of the ones I've seen in the past have
16 required the suppressors be drilled out further.  So there's an
17 additional step, not unlike a ghost gun, where the end cap and
18 the (indiscernible) have to be drilled out so that a projectile
19 can pass through them.
20    This -- this silencer is different from many of the
21 others I've seen because it came with two end caps.  And the
22 baffles were already -- had -- had -- had a hole in them,
23 (indiscernible) through.  One had (indiscernible) the cap.  And
24 one end cap had a hole in it, so that it could be immediately
25 used as a suppressor.

1          During the interview, he also had further discussions
2  about his white supremacist ideology.  He confirmed that.  He
3  was initially released because it -- they were proceeding on
4  state charges.  They received a call regarding -- in -- in the
5  (indiscernible).  The FBI connecting it to potential domestic
6  terrorism.  I'm still investigating that, your Honor.  So, at
7  this time, I'm actually asking the Court to disregard that.
8  But they did get a further warrant to go back into the house to
9  find further material.  In that case, how -- they collected
10 electronic material.  They also collected, at that time, pipes.
11 Sections of pipe -- two (indiscernible) sections of pipe.  One
12 which had an end cap on it, which was consistent with, you
13 know, the beginnings of a pipe bomb.  Explosive residue
14 analysis has not yet been conducted, but they have been saved
15 for that.
16         Also, in the initial -- in the initial search, they
17 did not find the lower receiver for the AR-15, and that's
18 during the second search that they found the lower receiver for
19 the AR-15 and determined that it was a (indiscernible) and had
20 not yet been completely drilled out.  But that Mr. Thibodeau
21 had a drill press and the jigs ready to have that -- have that
22 firearm completed.
23         The weight of the evidence, your Honor, given the
24 fact that he actually received the suppressor in the initial
25 analysis by the ATF, I think the -- the weight of the evidence

1  falls -- the least important factor is strong here.
2          Physical and mental condition.  Additional
3  information that we have received in the course of our
4  investigation is that -- one of the things that gave us concern
5  is that in 2015, specifically in September of 2015, when the
6  defendant was still in high school, he actually called in a
7  school threat, to shoot up a school.  That was investigated at
8  that time.  And the -- the recommendation -- there was no
9  criminal action taken but there was a recommendation that he
10 could be a -- said that he was a (indiscernible).  That he --
11 they did a mental psych. evaluation.
12          I don't have the results of that mental psych.
13 evaluation.  But given that and what has happened here, I think
14 that a mental health evaluation here may be appropriate.  I
15 understand that the pretrial report says that he -- that
16 there's no indication that he had.  But I have the report on,
17 and I'm willing to produce that in evidence, that says that he
18 was -- a (indiscernible), you know (indiscernible).
19          Family ties.  Clearly his -- he has family ties to
20 California.  His mother and brother.  He is not employed, from
21 what our -- from what we understand.  And that's what -- that
22 comes from the pretrial report.  Neither -- nor does he have
23 financial resources, as I understand it.
24          And he (indiscernible) pretrial -- pretrial report.
25          Length of residence.  He's been a United States

Case 3:21-cr-01163-GPC   Document 20   Filed 05/17/21   PageID.43   Page 8 of 19

8

1    citizen, and has lived in California his entire life.

2              You know, we don't have anything relating to history

3    of drug or alcohol abuse, and he has no criminal history.

4              That said, your Honor, I think, given all the factors

5    here, given his ability -- the problem with these ghost guns is

6    that even if the Court were to prohibit him from owning or

7    possessing firearms, there is nothing to stop him from ordering

8    all of these parts -- ordering all of these parts again.

9    Because they can travel freely over state lines because they

10   are not considered firearms.  So there is no background check.

11   There is no way to stop him from getting these parts should

12   he -- he order them again.  And he has the ability -- has shown

13   the ability to build a firearm should he want one.

14             For all of these reasons and the (indiscernible) --

15   the -- the concerns about the pipe bomb, I think that detention

16   is appropriate here.  And we note that Pretrial agreed with our

17   (indiscernible) in this case.

18             With that, your Honor, we would submit.

19             THE COURT:  All right.  Thank you, Mr. Kimura.

20             Ms. Regan.

21             MS. REGAN:  Your Honor, first of all, a couple of

22   factual things.

23             He did not call in a school shooting.  He was being

24   bullied by some people at school.  I think seven people in the

25   gym were bullying him.  And he said to a friend, like, oh, this

1    is why people do school shootings, or something like that.  I
2    think they took his backpack and were throwing it around.  You
3    know, like he was being bullied.  And he said that -- made a
4    comment to somebody.  And that girl reported it.  He did not
5    phone in a school shooting.  That's completely not accurate.
6              He's 20 years old, your Honor.  He has no criminal
7    record whatsoever.  This is not a presumption case.  Actually,
8    for just what he's charged with, it's actually not even a case
9    that carries that much time in custody.
10             He possesses the suppressor device without
11   registering it; it was delivered that same day.  I don't think
12   he had time to register it, even if he was going to.
13             He had a gun that was almost complete but the gun was
14   not complete.  He is only 20 years old.  He has an older
15   brother.  His older brother had the firearm.
16             Mr. Thibodeau was going to join the military until
17   about two weeks ago.  He was screened out for having childhood
18   asthma.
19             So all of his military memorabilia, things like that,
20   I think, are being, you know, taken as, you know, white
21   supremacist ideology.
22             And even if he is a white supremacist, it is not
23   against the law to be a white supremacist.  It's not against --
24   I mean, maybe it's not a great thing to be.  You know, it's not
25   very popular.  Among certain circles, I believe, maybe it is.

1              But -- but, you know, he is a 20-year-old kid.  He's,
2  you know, waiting to get in the military.  He was on the
3  Internet.  He's maybe, you know, looking at some stuff.  But, I
4  mean, it's not against the law to look at things and to be
5  curious.  I don't think that makes him, you know, a threat to
6  society.  And his mom and his brother are here.  I mean, he --
7  he's probably a kid who would benefit getting out on bond,
8  being supervised, and being able to get a job and to be out in
9  society.  You know, maybe this is actually, you know, something
10 where he -- you know, a turning point in his life for him.
11             And one of the things that they seized -- I think
12 they said it was a Nazi -- I think it was actually a Halloween
13 costume from the year before.  His mom sent me a picture.
14             So I would ask that the Court release him on a
15 $15,000 personal appearance bond secured by the signature of
16 his mother.  She works at Walmart.  She makes about $30,000 a
17 year.
18             She is willing to, you know, cosign for him; to
19 having him at home.  Obviously, he's not going to order any
20 more gun parts.  He didn't have all of the parts for the gun.
21 And the reason he didn't is because he wasn't old enough.  He
22 thought he had -- could get a hunting license and possess a
23 gun.  But he couldn't because of something.  But, anyway, so
24 that's the whole reason why he didn't have a complete gun.
25             So, your Honor -- and the gun that they seized at the

1    house was not his gun.  I mean, the pieces, I believe, were in
2    his possession.  But the other gun was his brother's gun.  And
3    I think his aunt had a gun there also.  So -- but they were
4    locked up, and he didn't have any access to those guns.
5           So -- so I am asking the Court to set bond in that
6    amount.  And, I mean, we can say what we want about his
7    ideology or -- you know.  But I don't think that that's -- you
8    know, doesn't mean that he's, you know, going to go do
9    something terrible.  I don't think there's any indication that
10   he's -- I think they asked you to disregard the domestic
11   terrorist language.  But, still, that's a pretty heavy
12   accusation to make about a 20-year-old kid who, you know, is
13   sitting in front of his computer for a year during COVID.  You
14   know what I mean?  I mean, he doesn't have any friends.  You
15   know.  But hopefully if he gets out on bond, he can get a job.
16   Pretrial will supervise him.  And he can, you know, get into
17   society and see what the world is really like, instead of a
18   computer.
19           THE COURT:  All right.  Thank you, Ms. Regan.
20           (Pause.)
21           MS. REGAN:  And also the piece that he bought, your
22   Honor, is marketed, like they say, as a -- a trap -- a solid
23   (indiscernible), which goes on the end of the gun.
24   (Indiscernible).  And stops it, you know.  You can move it back
25   and forth.  And I think he -- although he said during his

1  interview that people use it for other things, he didn't say he
2  was going to use it for something else.
3          THE COURT:  All right.  Mr. Thibodeau, there are four
4  factors I have to consider to determine whether you should be
5  released or detained.  I'll go through those right now.
6          The first factor is the nature and circumstances of
7  the offense.  And you are charged with an offense involving
8  firearms, possession or transfer of an item that must be
9  registered through the National Firearms Act.  I do find that
10 the nature and circumstances of the offense favor detention
11 here.
12         The weight of the evidence also weighs in favor of
13 detention, but that's the least important factor I have to
14 consider.
15         With regard to whether you're a danger to any person
16 or the community, I have heard the -- the Government's
17 concerns, and I -- I share them.  There is some concern about
18 possibly having the materials to make a pipe bomb.  This 2015
19 alleged threat to shoot up the school.  I understand that's a
20 matter of debate between the parties about whether that was a
21 comment made to the friend or an actual received threat.
22         And during the interview in this case -- at least one
23 interview -- he made a remark to the federal agents that they
24 were federal f'ing pigs.  So all that does is suggest to me
25 that there's some evidence of dangerousness.  But I would find

1   that I -- I would note that he has no prior criminal history.
2   No actual history of -- of violence.
3           There's this history, I guess, of -- potentially of
4   threats, but I would find that the Government has not shown by
5   clear and convincing evidence that he's a danger to any person
6   or the community.
7           I think that this factor, however -- the items I just
8   mentioned and the white supremacist literature are concerning.
9   And I think this factor weighs at best neutral for
10  Mr. Thibodeau, and one could argue that it weighs somewhat in
11  favor of detention as well.
12          Turning, finally, to Mr. Thibodeau's history and
13  characteristics.  I think this is the area where the -- the
14  circumstances do weigh much more in favor of setting bail.
15          The only items that stand out to me is -- in his
16  history and characteristics as favoring detention are the fact
17  that he's unemployed.  He doesn't have any financial ties to
18  the United States.  And also, I guess, I would put the white
19  supremacist literature and some of these other items I
20  mentioned earlier in the category of history and
21  characteristics that weigh in favor of detention.  I guess that
22  could fall under character of past conduct as well.
23          On the other hand, the vast majority of the history
24  and characteristics weigh in favor of setting bail here.  He
25  has no prior criminal history.  He has a stable residence and a

1   long length of residence in the community.
2           He has strong family ties.  He currently lives with
3   his mother and brother.  He's single and has no children, but
4   he still has strong family ties.
5           He reports no foreign travel.  His mother said when
6   he was younger, he went to Mexicali once for a funeral.  But it
7   appears that he's lived his entire life here in the United
8   States and locally.
9           There isn't much in the way of community ties, so I
10  would find that to be a neutral circumstance.
11          He does have a financially responsible surety who is
12  willing to step up for him.
13          There's no history of drug or alcohol abuse.  And I
14  would find that his mental condition and physical condition
15  weigh in favor of setting bail.
16          I realize the Government has raised the issue of his
17  mental condition in light of the 2015 threat regarding the
18  school.  But both sides have proffered different evidence about
19  that, so I'll find that his mental condition weighs in favor of
20  setting bail as well.
21          On the whole, I find that his history and
22  characteristics weigh heavily in favor of setting bail.  And,
23  on the whole, I would find that conditions can be set that will
24  assure the safety of the community and Mr. Thibodeau's return
25  to court.

1       So I'll respectfully deny the Government's motion to
2  detain Mr. Thibodeau.  And I'm going to set these conditions
3  for your release, sir.
4       Your travel will be restricted to San Diego County
5  and Imperial County.  You may not enter the country of Mexico
6  during this case.
7       You will be released on a $20,000 personal appearance
8  bond, secured by the co-signature of one financially
9  responsible and related adult.  I will also order a cash
10 deposit in the amount of $2,000.
11      You must actively seek or continue full-time
12 employment or schooling or a combination of both.
13      Reside with a family member or surety.
14      Surrender your passport, if you have one.
15      I'll order that you submit to any psychological or
16 psychiatric treatment ordered by the Pretrial Services Office,
17 in their discretion.
18      And you must participate in our location monitoring
19 program, which will be a curfew in the discretion of Pretrial
20 Services.  And the technology will also be in the discretion of
21 Pretrial Services.
22      And that will be the order for Mr. Thibodeau.
23      MR. KIMURA:  Your Honor, if I --
24      THE COURT:  I'm sorry?
25      MR. KIMURA:  If I may, your Honor.  I just have a

1  couple of things that I would like to put on the record.

2  THE COURT: Sure.

3  MR. KIMURA: First, with regards to the school

4  shooting, I don't actually know whether it was a call or not.

5  And it doesn't seem to matter, but I want to clarify that.

6  That was just my interpretation from what I read from the

7  report.

8  But more importantly, your Honor, I think that -- I

9  have concerns about him returning back to the residence that he

10 had.

11 If Ms. Regan is right and these firearms belong to

12 someone else, these are very illegal firearms by any measure.

13 And I'm still concerned about -- if he's going back to the same

14 environment, where people are storing these types of firearms,

15 or obviously disregarding the law, I don't know if they are an

16 appropriate place for him to be.

17 We would also ask for this Court to stay the -- this

18 order at least over the weekend so we can determine whether or

19 not to file an appeal with the district court. And that's it,

20 your Honor.

21 THE COURT: Okay. So I'm going to -- well, first of

22 all, I -- that reminds me, there was one other condition that I

23 wanted to set.

24 The -- there's a standard condition that says the

25 defendant must not possess or attempt to possess a firearm,

1  destructive device, or other dangerous weapon; and that the
2  defendant must legally transfer all firearms as directed by the
3  Pretrial Services Office. I'm also going to order that he not
4  possess any firearm parts.
5           MS. REGAN: Your Honor, we believe those guns were
6  actually taken by the Government, so they're not in the home.
7  And they're not going to have any other guns there.
8           THE COURT: So I am also going to expand the
9  residence to include not just residing with a family member or
10 a surety, but he may also reside at a residence approved by the
11 Pretrial Services Office if they determine that his current
12 living environment isn't an appropriate place for him to
13 reside. Pretrial Services must approve his living situation.
14          I'll upgrade the location monitoring to home
15 detention. So that's a little different than the curfew.
16          Basically, Mr. Thibodeau, you would be restricted to
17 your residence at all times except for Pretrial Services'
18 approved absences for employment, education, religious
19 services, medical, substance abuse, or mental health treatment,
20 attorney visits, court appearances, and any other court-ordered
21 obligations or other activities approved by the Pretrial
22 Services Office.
23          So there are a number of reasons you can leave your
24 residence for but otherwise you would be confined to your
25 residence. Again, the technology to monitor that would be in

```
 1   the discretion of the Pretrial Services.
 2              All right?
 3              That will be the order for Mr. Thibodeau.  I will
 4   stay this order until Monday, April 5th.
 5              Actually, I'll just -- I'll put as a condition,
 6   defendant -- I don't think it's likely he would be released
 7   over the weekend anyway.  But I'll put as a condition the
 8   defendant will not be released until April 5th, 2021, at the
 9   earliest.
10              MS. REGAN:  Your Honor, I won't submit the bond
11   unless I speak with Mr. Kimura.  I know (indiscernible).
12              THE COURT:  Okay.
13              MS. REGAN:  Thank you.
14              THE COURT:  Sounds good.  Thanks so much.
15              MS. REGAN:  Thank you.
16              MR. KIMURA:  Thank you, your Honor.  Have a nice
17   weekend.
18              THE COURT:  You, as well.
19              THE CLERK:  Mr. Thibodeau, that's all for today.
20   Thank you, sir.
21              THE DEFENDANT:  Thank you, your Honor.
22              THE COURT:  Have a good weekend, Mr. Thibodeau.
23              THE DEFENDANT:  Thank you.
24              (Conclusion of proceedings.)
25
```

1
2                              --oOo--
3
4    I certify, by signing below, that the foregoing is a correct
5    stenographic transcript of the oral proceedings had in the
6    above-entitled matter this 13th day of May, 2021.  A transcript
7    without an original signature or conformed signature is not
8    certified.  I further certify that the transcript fees and
9    format comply with those prescribed by the Court and the
10   Judicial Conference of the United States.
11
              /S/ Amanda M. LeGore
12            _____
13         AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290