1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,       .
                                     .
5                 Plaintiff,         . No. 21-cr-1163-GPC
                                     .
6                    v.              . May 20, 2021
                                     . 2:35 p.m.
7    BRIAN MATHEW THIBODEAU,         .
                                     .
8                 Defendant.         . San Diego, California
     . . . . . . . . . . . . . . .

9

10                  TRANSCRIPT OF BOND HEARING
               BEFORE THE HONORABLE ANDREW G. SCHOPLER
11                UNITED STATES MAGISTRATE JUDGE

12

13   APPEARANCES:

14   For the Government:    United States Attorney's Office
                            By: BRANDON JAMES KIMURA, ESQ.
15                          880 Front Street, Room 6293
                            San Diego, California 92101
16
     For the Defendant:     Law Office of Diane M. Regan
17                          By: DIANE M. REGAN, ESQ.
                            414 South 4th Street
18                          El Centro, California 92243

19
     Transcript ordered by: Law Office of Diane M. Regan
20
     Transcriber:           Chari L. Bowery
21

22

23

24   Proceedings Recorded by Electronic Sound Recording;
     Transcript Produced by Transcription
25

1           SAN DIEGO, CALIFORNIA; MAY 20, 2021; 2:35 P.M.

2                               -o0o-

3           THE CLERK:  Matter Number 14, 21-cr-1163-GPC,

4    U.S.A. v. Brian Mathew Thibodeau.

5        Ms. Regan, are you here?

6           MR. KIMURA:  She is outside.  I will get her.

7        (Court hears unrelated matter.)

8           MS. REGAN:  I am sorry, Your Honor.

9           THE CLERK:  Recalling matter Number 15,

10   21-cr-2394-BAS, U.S.A. v. Moises -- I am sorry -- matter

11   Number 14, 21-cr-1163-GPC, U.S.A. v. Brian Mathew Thibodeau.

12          MS. REGAN:  Good afternoon, Your Honor.  Diane Regan

13   for Mr. Thibodeau.  He is here on bond.

14          THE COURT:  Good afternoon, Ms. Regan.

15          THE CLERK:  (Inaudible.)

16          MR. KIMURA:  Good afternoon, Your Honor.  Brandon

17   Kimura for the United States.

18          THE COURT:  Good afternoon, Mr. Kimura.

19       (Court hears unrelated matter.)

20          THE COURT:  All right.  Let's now take care of

21   Mr. Thibodeau's case.  All right.  So, I have reviewed the

22   papers here.  I understand the parties are -- don't have an

23   agreed-upon disposition in this case.

24       Ms. Regan, do you want to be heard?

25          MS. REGAN:  Yes, Your Honor.

1       One thing that wasn't clear in my papers, Mr. Thibodeau's

2   case is basically about him purchasing an off-label, or what

3   the government considers a silencer, what is marketed as a

4   solvent trap, which is a cleaning apparatus for a gun.  All of

5   this extraneous, you know -- his political ideology, all of

6   that stuff at this time really doesn't have anything to do with

7   the charges he faces.

8       And he is on very, very restrictive conditions.  If you

9   think about it, anything that he supposedly did, he was at

10  home.  He is not a person who goes out and is outside, doing

11  things.  The only thing he leaves to do -- he likes to do

12  exercise, go to the store, go fishing with his mom, and things

13  like that.  And having him on restrictive GPS conditions really

14  is unfair, and I don't think it's warranted due to the type of

15  case it is.

16      I mean, the allegations, at first, you know -- it was in

17  the newspaper.  I am not sure if you read in the newspaper, you

18  know --

19          THE COURT:  I do not.

20          MS. REGAN:  Basically, it came up in the complaint,

21  domestic terrorist.  But during the bail hearing -- we don't

22  know about that right now --

23          THE COURT:  I recall.  Yeah.

24          MS. REGAN:  -- but do you understand what I am

25  saying?  So, it's making room to -- (inaudible) the United

1    States says, you know, he is a white supremacist, terrorist,

2    killer, and really, that's not what this case is really about.

3    It's about -- his guideline range is not really high.  His

4    enhancements, he doesn't really qualify for any of those.

5    Those are for people with prior felonies.

6         So I would ask that we would take the GPS conditions -- I

7    don't think they are really even effective because he is not

8    restricted from -- he is just kept at home, but anything -- if

9    he wanted to do some -- anything he could do from his house, is

10   what I am saying.  It is not -- it is not really serving any

11   purpose.

12        And, also, he wants to be able to exercise, and that's

13   pretty much what he does.  He doesn't do a lot of stuff.  He is

14   not out and about all the time, especially because of COVID.

15   But he wants to go places with his family.  He wants to be

16   outside after eight o'clock at night, especially in the Valley,

17   I mean, in the summer.  If you have a barbecue, it doesn't

18   start until eight o'clock at night, or 8:30, because it is too

19   hot.

20            THE COURT:  Is he not able to organize departures

21   from his home, for a run or gym visit, with pretrial services?

22            MS. REGAN:  No, they won't allow it.

23            THE COURT:  Okay.

24            MS. REGAN:  And also, even being outside of his house

25   that late, he can be in the yard until 8:00.  After that -- so

1    he is basically running in circles around his house, you know.

2    I just don't think it's warranted, and I ask the Court take it

3    off.

4         Also, about the counseling and the psychiatric evaluation,

5    he's being asked questions that could be incriminating to him,

6    you know, just the way the government's going in this case, of

7    the other allegations that don't have anything to do with the

8    charges.  But he is being asked about his thoughts, and his,

9    you know -- kind of all part and parcel of his political

10   ideology, what he is thinking, and some of that stuff could be

11   incriminating.  All of it is discoverable to the government.

12        So, giving him therapy to help him to -- you know, get him

13   through these hard times isn't really going to help him if he

14   can't talk about what he wants to talk about.  Do you

15   understand what I am saying?  So I think the purpose of therapy

16   would be thwarted because he is not going to feel comfortable

17   to answer the questions, you know, without thinking he is going

18   to incriminate himself.  So that's why I asked about the

19   therapy condition and the psychiatric evaluation.

20        I don't think the psychiatric evaluation is tied to, you

21   know, if he bought this operable silencer -- or solvent trap is

22   what it was, or able to be.  It doesn't have anything to do

23   with a psychiatric condition.

24        Also, the things that were found -- the guns that were

25   found in the house were not his guns.  They were legally

1   registered to his aunt, who has -- you know, she is married,

2   but she just got married; a lot of her stuff is still at the

3   house -- and to his brother, who's 21 years old and able to

4   have a firearm.  They were locked up.  He had no -- no access

5   to them.

6        And he didn't even have a whole gun himself, if Your Honor

7   knew the facts.  He was missing a piece.  And he was actually

8   waiting until he was 21 to get a legal one.

9        So, it was something he was interested in.  A lot of

10   people are interested in firearms.  It doesn't mean he is crazy

11   or, you know, a white supremacist, starting a terror attack or

12   something.

13        So, I would submit, Your Honor.

14            THE COURT:  Thank you, Ms. Regan.

15        Let's hear from pretrial services.

16            PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

17        I would just like to clarify that the location monitoring

18   under home detention -- I am sure Your Honor is aware of the

19   recent guideline changes, and, unfortunately, exercising

20   outside of the home is considered a pure social activity that

21   I, myself, do not have the discretion to approve.  So it is not

22   that my agency is purposely restricting it to the residence.

23   We certainly could allow him to go for a run and exercise if

24   Your Honor gives us the permission to do so.

25            THE COURT:  Okay.

```
 1              PRETRIAL SERVICES OFFICER:  So, going forward, we
 2    would be able to do that.
 3         Also, on May 10th, we did refer Mr. Thibodeau for a mental
 4    health assessment at Dr. Pizitz's office.  He met with
 5    Dr. Luiza (phonetic).  We did receive the assessment back, and
 6    the recommendation was for individual counseling.  So we were
 7    going to proceed forward with individual counseling because
 8    that is the recommendation of the professionals.
 9         Also, Dr. Pizitz -- we had further conversations with
10    Dr. Pizitz, and he recommended a psychiatric evaluation due to
11    lack of information that was provided during the mental health
12    assessment.  And certainly, reviewing the mental health
13    assessment, there are factors noted in there that are
14    concerning that would, you know, be worthy of sending him for a
15    psychiatric evaluation.
16         And also, my agency, we work directly for the Court.  We
17    are a neutral party, so any information that we gather is
18    strictly confidential, so the psychiatric evaluation would only
19    be released to my agency, so it doesn't get sent out to anybody
20    else, nor can it be used to prove guilt in any criminal case.
21              THE COURT:  Thank you, Ms. Zvers.
22         Mr. Kimura?
23              MR. KIMURA:  Yes, Your Honor.
24         First of all, I want to clarify one thing.  Even though
25    the concern, obviously -- Ms. Regan mentioned that a lot of
```

 1   this doesn't relate to the charges, what we are here for.  And

 2   the concern that we brought up from the very start and that we

 3   had is with danger to the community.  And that is very much

 4   within the focus of -- within the purview of this Court and the

 5   focus of this type of hearing.  And I think mental health,

 6   obviously, is a very central pillar of that.  And, obviously,

 7   GPS is a central pillar of that.

 8       And I think that that is why those -- you know, obviously,

 9   I don't -- I can't put myself in your shoes, Your Honor, but I

10   think that is why those restrictions were made.  And I think

11   they were wise.  And I think at the time, with the information

12   that we had -- that you had -- I think that they were

13   appropriate, and I still think that they are appropriate.

14       It's also fortuitous in the sense that we have been

15   going -- this is a case that was reactive in nature, and we

16   have been going through as much we can, and we have a lot of

17   data.  We have also gone through his notebooks.  So we have

18   additional information now that we believe that not only are

19   these types of restrictions appropriate, we think that -- we

20   were actually on the verge of asking Your Honor to reconsider

21   whether detention was appropriate.  And so, I don't know if

22   Your Honor is willing to listen to that now, but we think there

23   is a certain urgency to it, especially with defendant trying to

24   get out of GPS, trying to get out of mental health.

25       And I understand -- look, we haven't had the opportunity,

1   at least in terms of the digital information, to provide that

2   to defense, because, honestly, we are not even done with the

3   return.  We are just -- we are going through things, and we are

4   seeing things, both within the context of our search warrant

5   but also in plain view, that, honestly, scares us.

6        And so, we are trying to see how --

7             THE COURT:  Can you share the details?

8             MR. KIMURA:  Yes.

9        So, let's go to the notebook first because the notebook

10  was written by defendant.  He is well aware of what is in that.

11       And there's obviously a lot of disturbing things about

12  building guns, military tactics.  What I found most

13  disturbing -- and this is a passage written under the heading,

14  "Past Life," but still:  "I have a fantasy of mowing down

15  hordes of men with a machine gun."

16       And that goes back to our concern of danger to the

17  community.

18       And I understand, he didn't have a working gun at the

19  time.  But if you remember, he was building an AR-15, which was

20  the purpose of the silencer, and he was -- he had a drill

21  press.  And I actually -- it's oversight on this part, but it

22  was seized -- that drill press wasn't seized at the time of the

23  search, and it is still, as I understand, in his custody.

24       But as you understand the problem with ghost guns, that we

25  can put every restriction on him not to own a firearm, but he

1   can legally buy all those parts and put it together himself,

2   and that is what he's been doing, and that is what he was

3   studying to do.  And within the scope of our warrant, we found

4   additional instruction manuals of how to put together an AR-15.

5       Now, we are going to go back now that we have seen things

6   in the warrants to expand our scope, but within the plain view

7   of our search, we found additional bomb-making instruction

8   guides that are related -- could be related to the pipes.

9       I will also tell Your Honor that we did test those pipes,

10  those six-inch pipes that we seized, for explosive residue, and

11  they did come back negative.  But we also have now found guides

12  and web pages related to making the bombs and, in some

13  instances, specifically pipe bombs, so that brings -- gives us

14  a lot of concern.

15      We also have seen references to anthrax, ricin, and also,

16  quite frankly, some very disturbing sexual items.

17      All of this doesn't rise yet to the level of a separate

18  charge but I think puts -- is well within the focus of whether

19  or not defendant is a danger to the community.

20      So all of that kind of brings us back to -- brings us back

21  to our original request to detain him based on a danger to the

22  community.

23      I would remind Your Honor that, even within the nature of

24  the crime itself, right, the silencer bought as a -- as a fuel

25  solvent or a solvent trap, that -- that solvent trap, because

1    of the way it was built, because it had an end cap that had a

2    hole in it and, based on his own statements, was ready to screw

3    onto that AR-15 that he was building and could have been used

4    as a silencer is if the gun was operational, and that is

5    disturbing.  And also, the fact that he's building a ghost gun.

6    Both of those things, to me, show an individual who's studying,

7    who can't be trusted to abide by the laws, because he is

8    obviously trying to figure out ways around it.  Right?

9        Even though the ghost gun is not illegal under federal

10   jurisdiction, it's definitely illegal under California

11   jurisdiction, and it would have been illegal if he had

12   completed it, which seemed to be his intent.

13       That's what our concern is here.  You know, not only the

14   fact that he is trying to get out of the those restrictions

15   that Your Honor very wisely imposed upon him, but all these

16   things that we are seeing now.

17       I think that, you know -- I think just, even in the

18   interim, detention in the interim, while I can get this

19   information to defense, and that he can bring -- he can bring

20   up whether or not detention is appropriate again.  It is not

21   going to be held -- your orders are always without prejudice,

22   and I think that that would be a nice interim option for this

23   Court.

24           THE COURT:  And I am sorry.  The interim option is

25   what?

1          MR. KIMURA:  Hold -- put him in detention and let

2     defense bring up whether or not detention is appropriate

3     because as you --

4          THE COURT:  Well, to the extent that you are moving

5     to detain him -- I am -- I would only hold that hearing right

6     now if Ms. Regan said that she wanted to go forward.  If she

7     wants more time on a government motion to detain, then I would

8     set it for another time.

9          MR. KIMURA:  We are moving, in this case.

10         THE COURT:  All right.

11         MS. REGAN:  Your Honor, I would like some more time.

12     And also, just to address the Court, that in his private

13     diaries, things like that -- we are talking about whether he is

14     a danger.  Has he, like, you know, met with people?  Has he

15     done weird stuff on the internet?  Does he have a plan?  Things

16     like that.

17         None of that -- I can pretty much tell you, none of that

18     is going to come to light.  This is a kid -- he was interested

19     in the military.  He wants to be in the military.  That is his

20     interest in guns, shooting.  He realized he could not -- he

21     actually had ordered one piece of the gun, then he decided to

22     wait because he thought that he could, with a hunting license,

23     legally own a gun.  He was trying to do everything legally.

24         If you talk to his family, you know, he was -- and he knew

25     he couldn't get a gun, so he was trying to (inaudible).  His

1   brother had a gun.  They liked to go shooting.  His stepdad was

2   in the military.  And so, that's his interest in guns, not

3   because he is, you know, going to do something terrible with

4   this gun.

5      But once he realized he couldn't own it, he sent back the

6   other piece.  I mean, he had actually ordered the other piece

7   and sent it back.  I mean, I actually talked to the people from

8   the Border Tactical, who called him, and he had called to make

9   sure it wasn't something strange.  But he actually ordered it,

10  and he had sent it back.  And it was strange that it was not in

11  their inventory, so that's why they called.

12     But, you know, Your Honor, anything that the Court, you

13  know, the GPS is just -- I don't know.  He wants to exercise --

14  basically, he wants to exercise.  He doesn't go anywhere.  He

15  doesn't do anything anyway.  And even if these things are true,

16  you know, it was done from his room.  He could do that in jail.

17  I mean, write something in a notebook.  I mean, it is his

18  personal thoughts.  I mean, anyone has the right to think what

19  they want.  We are in the United States, here.  There is no

20  allegation of a plan.

21     From speaking with him, with his family, I don't think

22  that's -- we are not going to find that, and that's why my

23  whole thing is this is a kid where he is interested in the

24  military.  He got screened out, like, a month before this

25  happened, for asthma, childhood asthma.  That was his lifelong

1   dream.

2       All these men in the area, a lot of people are into it.  A

3   lot of people like to look at weird stuff on the internet, you

4   know, not even just about -- but the Court knows, the internet

5   is full of crazy stuff.  So -- but that does not mean that he

6   is a danger to the community.  There's been no showing that he

7   is going to -- has any plan to do anything or that he was

8   planning to do anything.  Except working, and you know, writing

9   stuff down in his personal journals.  People have fantasies

10  about all sorts of stuff.  It doesn't mean that they actually

11  do them, and that's why they are called fantasies.  Most people

12  don't live out their fantasies, except on an island.

13      So, Your Honor --

14          MR. KIMURA:  Your Honor --

15          MS. REGAN:  -- I would object to detention at this

16  time and (inaudible).

17          THE COURT:  I am happy to have you complete the

18  record, Mr. Kimura, that at this time I would be inclined to

19  largely deny the motion to modify conditions of release.

20      With regard to the psychiatric evaluation, I agree with

21  pretrial; I wouldn't be -- I mean, that is something that's

22  going to be shared with the Court, but I wouldn't be inclined

23  to release that to the government at this time, unless there's

24  some showing or case law that would make that appropriate.  It

25  seems to me that the defendant ought to be able to -- we want

1   to treat him for whatever psychiatric issues may be afflicting

2   him for the safety of the community and for his own benefit,

3   and I don't want him feeling like he has to hold things back

4   because they will be used against him by the government.

5        So, I am -- I would, therefore, respectfully deny the

6   request to take that condition away.  I think that it's

7   important for Mr. Thibodeau's own health to get the full access

8   to mental health treatment that he can get.

9        With regard to taking the GPS condition off, also, I feel

10  that's an appropriate condition.  I am willing to modify it a

11  little bit to allow exercise, but what I would like to do is I

12  want to give that some more thought about how we would do that

13  appropriately, and also the government has proffered that they

14  have additional evidence that they would want to bring forward

15  at a detention hearing, so I think I will hold off on making

16  any modifications to the pretrial release order at this time.

17       We will have a detention hearing early next week, and if

18  he is detained, then this is moot.  If he is not detained, then

19  we can consider an appropriate modification to give him a

20  little bit more freedom to engage in exercise and that sort of

21  thing.

22       Mr. Kimura, was there anything else you wanted to say?

23            MR. KIMURA:  Yeah, just a couple of things.

24       First, with regards to, you know, Ms. Regan's thing that

25  you need a plan.  You don't need a plan to shoot down a bunch

1   of people.  All you need is a gun, and that's what he was

2   building.

3        In addition to that, we also have -- in our search, we

4   saw -- we have seen screenshots of maps of FBI offices.  We

5   have seen screenshots of roadways, bridges, power lines,

6   messages about, you know, talking about damaging those things

7   and sabotaging those things.  And so that's -- I mean, you

8   know, you don't need much of a plan to do what he said he wants

9   to do or he's fantasized about doing in his notebook.  But, to

10  the extent that you need a plan, he's already has -- he already

11  has done some of that.

12       With regards to, you know, again, we are going to move for

13  detention here, but also, if Your Honor's going to consider

14  whether or not to put -- expand his GPS, I -- we are -- the

15  United States would like to have access to his GPS coordinates

16  because, quite frankly, we are concerned about where he goes

17  and what he is going to do with that additional freedom.

18       I guess we can all -- we can probably save that until Your

19  Honor makes the decision, and that's probably at the next

20  hearing.

21            THE COURT:  Okay.  Yesenia, when is our next

22  available date for a detention hearing?

23            THE CLERK:  Your Honor, can we set it for next

24  Thursday?

25            THE COURT:  May 27?

```
 1              THE CLERK:  Yes, Your Honor.  At 3:30 p.m.

 2              THE COURT:  Will that work for the defense?

 3              MS. REGAN:  Your Honor, I actually have a traffic

 4    trial that day.  And the next week, I am in trial.

 5              THE COURT:  Do we have anything earlier in the week?

 6              THE CLERK:  I was trying to keep it clear, but --

 7              THE COURT:  Oh.  Oh, yeah.

 8              THE CLERK:  One second, Your Honor.  Let me just see.

 9        Can we do it June 1st, Your Honor?

10              THE COURT:  I hate to delay, for 12 days, a detention

11    hearing unless there's really good reason to do so.

12              THE CLERK:  Okay.

13              THE COURT:  Can we do it late on Tuesday?

14              THE CLERK:  Yeah.  2:00 p.m. on Tuesday, Your Honor.

15              THE COURT:  Okay.  We can make it later if you -- if

16    that's going to --

17              THE CLERK:  No, it is just --

18              MS. REGAN:  I have court in El Centro, Your Honor, on

19    Tuesday, at 1:30.

20              THE COURT:  Okay.  Well, it doesn't look like Tuesday

21    or Thursday will work for next week.

22              MS. REGAN:  I am sorry.

23              THE COURT:  Would -- so I guess we can push into the

24    next week.

25              THE CLERK:  The following week is June 1, Your Honor.
```

```
1              THE COURT:  Okay.  June 1, at 2:00 p.m.

2              THE CLERK:  2:00 p.m. -- yes.  2:00 p.m.

3              THE COURT:  Will that work, Ms. Regan?

4              MS. REGAN:  I have a trial starting the next day.  I

5    have a readiness on June 1st.  I don't know if it's going to go

6    or not.

7         I guess we can -- can we set it at 2:00 p.m., Your Honor,

8    with a caveat that if -- I think it is at 9:00, but I am not --

9    that should work.  The 1st at 2:00?

10             THE CLERK:  We can set it for 3:00 p.m.

11             THE COURT:  All right.  Will 3:00 p.m. give you

12   enough breathing room?

13             MS. REGAN:  I think so, Your Honor.  I mean --

14             THE COURT:  June 1st, 3:00 p.m.  So, let's say

15   June 1st at 3:00 p.m.

16        Will that work for you, Mr. Kimura?

17             MR. KIMURA:  Is there any way Your Honor would

18   consider allowing another (inaudible) judge -- especially if a

19   lot of this is about location, Ms. Regan being in El Centro,

20   maybe Judge Montenegro hearing this?

21             THE COURT:  I would prefer to handle it myself since

22   I have read up on the facts.

23        Is there any way we can do it -- can you look at -- can

24   you schedule this as a standalone on Wednesday of next week or

25   something like that?
```

1          (Discussion between clerk and Court.)

2               THE COURT:  Okay.  4:00 p.m. on Wednesday?

3               MS. REGAN:  I am sorry?

4               THE COURT:  That's May 26th.

5               MS. REGAN:  That's fine, Your Honor.  I have a

6     mat wit hearing, but I think it's telephonic, at 2:00, so I

7     can -- it's on at 4:00?

8               THE COURT:  4:00 p.m., Wednesday, on Wednesday.

9               PRETRIAL SERVICES OFFICER:  Your Honor, would you

10    like us to go ahead and schedule the psychiatric evaluation, or

11    should we wait until after he --

12              THE COURT:  No, you can go ahead and schedule that.

13              PRETRIAL SERVICES OFFICER:  Okay, Your Honor.

14              THE COURT:  I don't want to delay his treatment.

15              MS. REGAN:  So, it's the 26th at 4:00 p.m.

16              THE COURT:  All right.

17         Well, your next court date, Mr. Thibodeau, is going to be

18    May 26th at 4:00 p.m., and then the very next day, you are

19    going to have a motion hearing/trial setting before Judge

20    Curiel, on May 27, at nine o'clock a.m., but that will be all

21    for today.  Good luck to you, sir.

22              THE DEFENDANT:  Thank you, Your Honor.

23              MS. REGAN:  Your Honor, the 27th, that is the day I

24    have the traffic trial.

25              THE COURT:  There's nothing I can do about Judge

1    Curiel's schedule.

2              MS. REGAN:  No.  No, that's fine.  No.  I -- I am not

3    going to reschedule for that, but I have to go back -- that's

4    fine.

5              THE COURT:  Yes.  And I think Judge Curiel will

6    probably tell you that federal court trumps a city --

7              MS. REGAN:  No.  No.  I have one in the morning, I

8    have a traffic trial in the afternoon.  I was thinking we could

9    do both on the same day, but that won't work.  It's okay.  I

10   will go back.  Thank you.

11             THE COURT:  Yes.  Sure thing.

12             PRETRIAL SERVICES OFFICER:  Thank you, Your Honor.

13        (End of proceedings at 3:20 p.m.)

14                             -o0o-

15

16

17

18

19

20

21

22

23

24

25

```
1                      C-E-R-T-I-F-I-C-A-T-I-O-N

2

3              I certify that the foregoing is a true and correct

4   transcript to the best of my ability from the electronic sound

5   recording provided to me by the U.S. District Court, Southern

6   District of California, of the proceedings had on the date and

7   time stated in the aforementioned cause.

8              I further certify that I am neither counsel for,

9   related to, nor employed by any of the parties to the action in

10  which this hearing was taken, and further certify that I am not

11  financially nor otherwise interested in the outcome of the

12  action.

13             DATED:  June 1, 2021, at San Diego, California.

14

15                      /s/  Chari L. Bowery
                        _____
16                      Transcriber

17

18

19

20

21

22

23

24

25
```